# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LEROY S. POULLARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12 C 7497 |
| v. | ) | |
| | ) | Judge Joan H. Lefkow |
| ERIC K. SHINSEKI, Secretary, U.S. | ) | |
| Department of Veterans Affairs, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

On September 19, 2012, Leroy S. Poullard filed suit against Eric K. Shinseki, Secretary

of the U.S. Department of Veterans Affairs ("the Secretary"). (Dkt. 1 ("Compl.").) Poullard

alleges that during his employment in the Education Department at the North Chicago Veterans

Affairs Medical Center, he was subjected to disparate treatment on the bases of race and sex,

retaliation, and a hostile work environment in violation of Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. §§ 2000e *et seq.* (*Id.*) The Secretary moved for summary

judgment on April 4, 2014. (Dkt. 39.) For the reasons stated below, the Secretary's motion is

granted.[1]

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242,

248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether any genuine fact issue

---

[1] The court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 42 U.S.C. § 2000e-5(f)(3). Venue is appropriate in this district under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3).

exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24.

## BACKGROUND[2]

Poullard is an African-American male who has worked as a Training Specialist in the Education Department ("the Department") of the North Chicago Veterans Affairs Medical

---

[2] Unless otherwise noted, the facts in this section are taken from the parties' Local Rule 56.1 statements and are construed in the light most favorable to Poullard. The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare*, 629 F.3d at 704 (citation omitted). In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and includes in this background only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion. Any facts that are not controverted as required by Rule 56.1 are deemed admitted.

In his reply brief, the Secretary moves to strike certain paragraphs contained in Poullard's response to the Secretary's Local Rule 56.1 statement on the grounds that those paragraphs contain additional facts that should have been included in Poullard's Local Rule 56.1 statement. (*See* dkt. 59 at 4.) Because the court considers only those portions of the parties' submissions that comply with Local Rule 56.1, the Secretary's motion to strike is denied as moot.

Center ("the VA") since 2004. (Dkt. 46 ("Def.'s L.R. 56.1") ¶ 1.) He was hired at the GS-9 pay grade on September 19, 2004 (dkt. 49 ("Pl.'s L.R. 56.1") ¶ 1) and was promoted to the GS-11 pay grade in April 2006 after a GS-11 Training Specialist left the Department. (Def.'s L.R. 56.1 ¶ 2.) At the time of his promotion, Poullard was the only Training Specialist in the Department. (*Id.*) Two individuals worked above him: his direct supervisor Kathleen Kusel, the Chief of the Department; and Kusel's superior, Marianne Semrad, the Associate Director for Facility Support. (Pl.'s L.R. 56.1 ¶ 3.)

## I.    Changing Job Responsibilities, 2007 EEO Complaint, and Temporary Promotion

Shortly after Poullard's promotion, Kusel retired as Chief of the Department making Semrad Poullard's direct supervisor and responsible for Kusel's duties. (Def.'s L.R. 56.1 ¶¶ 3–5.) According to Poullard, however, he, not Semrad, assumed all duties and responsibilities of the Chief of the Department, a GS-13 position. (Compl. ¶ 10.) Indeed, Semrad noted in the comments section of an October 26, 2006 performance review that Poullard had "become a one-person Education Department" as other staff retired or changed jobs. (Pl.'s L.R. 56.1 ¶ 7.) Poullard served as the administrator for the TEMPO database, "chaired" the Education and Management Committee, and had the authority to approve overtime for all employees in the Department. (*Id.* ¶ 8.) Semrad, in contrast, spent less than an hour per day in the Department. (*Id.* ¶ 6.)

Given his increased responsibilities, Poullard became dissatisfied and believed that he was performing the duties of a GS-13 employee without the corresponding title or compensation. (Def.'s L.R. 56.1 ¶ 6.) Although Poullard was not promoted, the Department gave Poullard a series of cash awards totaling over $12,000 for the period of time during which he was the sole Training Specialist at the Department. (Pl.'s L.R. 56.1 ¶ 11.) Semrad testified that these

payments added up to the difference between a GS-11 and a GS-12 pay grade. (Def.'s L.R. 56.1 ¶ 7.) Poullard, however, believed these payments were insufficient. (*Id.* ¶ 8.)

Pursuant to the collective bargaining agreement in effect at the VA during the relevant time period,[3] an employee in Poullard's position could be promoted in two ways. First, he could apply for a promotion to a specific position. (Dkt. 52-4 Exh. 5 § 6.A.) Second, he could request a desk audit to determine whether, "due to the accretion of additional duties and responsibilities," his position should be "reclassified at a higher grade." (*Id.* § 7.A.1.) In April or May of 2007, Poullard requested a desk audit to facilitate an accretion-of-duties promotion. (Pl.'s L.R. 56.1 ¶ 15.) Poullard's request was denied. (*Id.*) Poullard contacted the VA's Office of Resolution Management on May 14, 2007 and, on June 18, 2007, he filed a formal equal employment opportunity ("EEO") complaint alleging discrimination on the bases of race, sex, disability, and reprisal. (*Id.* ¶ 13.)

Shortly thereafter, in an email dated June 29, 2007, Semrad informed Poullard that, while certain duties Poullard had been performing would be used to justify a forthcoming temporary promotion, they would not appear in his GS-11 position description.[4] (*Id.* ¶ 16.) At some point, Semrad also informed Poullard that he was ineligible for promotion to the position of Chief of the Department because he had not worked for one year at the GS-12 grade and thus did not

---

[3] The Secretary asserts that the collective bargaining agreement has not been properly authenticated. The agreement, however, is one of the exhibits attached to Poullard's deposition transcript and is authenticated by Poullard's deposition testimony. (Dkt. 52-1 Exh. 22 ("Pollard Dep.") at 147: 17–24.) Accordingly, the agreement is properly before the court. *See Hackel* v. *Nat'l Feeds, Inc.*, 986 F. Supp. 2d 963, 969 (W.D. Wis. 2013).

[4] In his Local Rule 56.1 statement, Poullard also states that he was informed that the managerial duties he performed following Kusel's retirement would not be included in his official personnel file. (Pl.'s L.R. 56.1 ¶ 15.) This statement, however, is not supported by the evidence to which Poullard cites. Indeed, in his deposition, when asked if he had been told that his duties would not be reflected in his official personnel file, Poullard responded, "No. I wasn't told that." (Poullard Dep. at 152: 13.) Poullard clarified that he was merely told that the duties would not appear in his GS-11 position description. (*Id.* at 152: 15–16.)

satisfy time-in-grade requirements. (*Id.* ¶ 23.) Poullard did not apply for the Chief position or any other position in the Department. (Def.'s L.R. 56.1 ¶ 18.) Poullard received a temporary promotion to the GS-12 pay grade in July 2007 which expired on October 28, 2007.[5] (*Id.* ¶ 10.)

On March 26, 2010, the Equal Employment Opportunity Commission ("EEOC") issued a Final Agency Decision in favor of the VA on Poullard's initial EEO complaint. (Dkt. 40-2 Exh. 7.) Poullard did not file a complaint in federal court within ninety days of that decision. (Def.'s L.R. 56.1 ¶ 14.)

## II.    Change of Supervisors and Further Objections to Job Responsibilities

Semrad left the Department in October 2007 and was replaced by Mary Ann Cardinali. (*Id.* ¶¶ 11–12.) On November 7, 2007, Richard Holt became the acting Chief of the Department, filling the position vacated by Kusel. (*Id.* ¶ 16.) In a performance evaluation for the period between November 16, 2007 and July 15, 2008, Holt gave Poullard a rating of "fully successful" and observed that Poullard had "managed the department with oversight of budget, programs, staffing, and operations." (Pl.'s L.R. 56.1 ¶ 21.) Dr. Norma Mailand was appointed Assistant Department Head for Education and Training in July 2008, effectively replacing Holt as Chief of the Department. (Def.'s L.R. 56.1 ¶ 17.) Accordingly, Mailand served as Poullard's direct supervisor and Cardinali was Mailand's superior. (*Id.* ¶¶ 12, 17.)

Around this time, the Department hired two new Training Specialists. (*Id.* ¶ 20.) In a telephonic affidavit taken by an EEOC investigator, Mailand stated that because the new Training Specialists lacked experience after they were hired, Poullard initially performed more duties than his co-workers. (Dkt. 40-1 Exh. 4 at 00323.) According to Mailand, however, the duties were redistributed after a training and transition period. (*Id.*) Poullard disagrees and

---

[5] Pursuant to the collective bargaining agreement, a temporary promotion to a higher pay grade may not exceed sixty days. (Dkt. 52-4 Exh. 5 § 7.A.7.) "[A]ny extension beyond [sixty] days must be made under competitive procedures." (*Id.*)

stated in a telephonic affidavit that he continually performed more tasks than the other Training Specialists between 2008 and 2010. (*Id.* Exh. 1 at 00227.) Moreover, while Mailand was nominally responsible for the duties of the Chief of the Department, Poullard testified in his deposition that after Mailand's appointment in 2008 he continued to perform managerial duties and responsibilities outside of his pay grade without promotion or additional compensation. (Pl.'s L.R. 56.1 ¶ 25.)

Throughout the period during which Mailand served as Poullard's supervisor, Poullard continually objected to performing tasks outside of his pay grade (Def.'s L.R. 56.1 ¶ 23), and he requested another desk audit in February or March of 2010 (Pl.'s L.R. 56.1 ¶ 15). In response to his concerns, Mailand asked Poullard to draft a document listing the duties he believed were outside the scope of his responsibilities; Mailand then had Poullard's workload evaluated by a classification specialist. (Def.'s L.R. 56.1 ¶¶ 24–25.) Mailand testified that the classification specialist reported back to her that Poullard's duties were within his position description as a GS-11 employee.[6] (*Id.* ¶ 25.) Poullard's request for a desk audit was denied. (Pl.'s L.R. 56.1 ¶ 15.)

### III. Additional Allegations

In addition to the circumstances discussed above, Poullard maintains that other events support his claims, in particular his claim of hostile work environment. (Def.'s L.R. 56.1 ¶ 28.) According to Poullard, in a staff meeting held in 2008, Cardinali instructed that the tape recorder used to record the meeting be turned off and stated, "I know people in Washington, D.C. and if you file a complaint, they are going to send it back to me and I'm going to deal with you." (Pl.'s L.R. 56.1 ¶ 27.) During this meeting, Cardinali threw a toy monkey at Poullard and stated that

---

[6] Poullard objects to the classification specialist's statement as hearsay. (Dkt. 48 ("Pl.'s L.R. 56.1 Resp.") ¶ 25.) The classification specialist's statement would be admitted, however, not for its truth, but to demonstrate its effect on Mailand in not granting Poullard's request for a desk audit. *See Cooper-Schut* v. *Visteon Auto. Sys.*, 361 F.3d 421, 430 (7th Cir. 2004) (affirming district court decision to admit statement for the effect that it had on the listener).

employees who brought grievances were like "monkeys" on the backs of management. (*Id.*; Compl. ¶ 23.) Poullard later received a document entitled "Management Time: Who's Got the Monkey?" which Cardinali referenced during the meeting. (Pl.'s L.R. 56.1 ¶ 27.) Poullard interpreted the reference to monkeys as a racial slur. (Def.'s L.R. 56.1 ¶ 30.) That same month, Mailand called Poullard a "sugar daddy." (*Id.* ¶ 31.)

On January 27, 2009, Poullard received a letter of admonishment for failing to follow the chain of command when he sent Holt an email message asking "to discuss Ms. Mailand's behavior and inappropriate actions toward me as soon as possible." (*Id.* ¶ 33; dkt. 49-5 Exh. 14.) In October 2009, Poullard's request for overtime was denied. (Def.'s L.R. 56.1 ¶ 33.) In November 2009, Mailand commented that Poullard looked more presentable after cutting off his "afro" (*id.*; Compl. ¶ 28), and that same month, Poullard received a "fully successful" performance rating (Def.'s L.R. 56.1 ¶ 33).[7] Further, Mailand demanded documents and set strict work deadlines for Poullard in February 2010, and Mailand refused to recognize the additional hours Poullard worked to coordinate an orientation event. (*Id.*) Moreover, Poullard contends that he received threats of disciplinary action in response to his complaints that he was performing Mailand's duties. (*Id.*) Finally, Poullard argues that the unequal distribution of work assignments in the Department contributed to the hostile work environment. (*Id.* ¶ 32.)

## IV.    Second EEO Complaint

Poullard contacted the VA's Office of Resolution Management on March 5, 2010 and complained of discrimination on the bases of race and retaliation. (Pl.'s L.R. 56.1 ¶ 31.) On April 17, 2010, Poullard filed a formal EEO complaint. (*Id.* ¶ 32.) On July 12, 2012 the VA's

---

[7] According to the complaint, this performance rating was objectionable because Poullard "was actually performing the essential job duties and responsibilities of Chief of Education" and therefore should have received a higher mark. (Compl. ¶ 27.)

Office of Employment Discrimination Complaint Adjudication ("the Office")[8] issued a Final Agency Decision in favor of the VA. (*See* Compl. Exh. A.) The decision dismissed three race and sex discrimination claims as untimely with regard to (a) the admonishment received on January 27, 2009, (b) denial of compensatory overtime in October 2009, and (c) a performance evaluation received on November 30, 2009. (*Id.* at 2.) The Decision denied on the merits his discrimination or retaliation claims (d) that he was given more assignments than other Training Specialists for July 2008 to May 25, 2010; (e) that he was required to work above his pay grade without adjustment of compensation; (f) that he was subjected to a hostile work environment and (g) retaliated against for having filed the previous EEO complaint. (*Id.* at 2–3.) Poullard timely filed the instant complaint within ninety days of receipt of the decision. (*See* Compl.)

In support of his retaliation claim, Poullard testified at his deposition that after filing his second EEO complaint, he was stripped of his managerial duties and relegated to processing tuition applications, auditing training folders, coordinating management training courses, and performing basic timekeeping duties. (Pl.'s L.R. 56.1 ¶ 33.) According to Poullard, these duties are appropriately performed by a GS-5 clerical worker. (*Id.*)

## ANALYSIS

### I.     Time-Barred Claims

#### A.     Claims Outside the Ninety-Day Filing Period

The Secretary first contends that events occurring in 2006 and 2007 that were raised in Poullard's initial EEO complaint may not support Poullard's current claims. A federal employee who believes he has been subjected to unlawful discrimination must first attempt to resolve the matter informally through an EEO counselor within forty-five days of the employment practice

---

[8] Although Poullard initially requested a hearing before an EEOC Administrative Law Judge, he subsequently withdrew his request. Accordingly, the matter was remanded to the Office for an immediate final agency decision based on the investigative record. (*See* Compl. Exh. A at 1.)

in question. 29 C.F.R. § 1614.105(a). If the matter cannot be resolved informally, the employee

may file a formal complaint with the EEO office. *Id.* § 1614.106(a). Then, if the employee

wishes to file a civil action in federal court, he must do so within ninety days of receiving notice

of the EEO's final decision, or, if the employee chooses to appeal the decision to the EEOC,

within ninety days of receiving the EEOC's final decision on appeal. 42 U.S.C. § 2000e-16(c);

29 C.F.R. § 1614.407(a). Filing even one day past the ninety-day deadline is fatal to a claim,

unless there is a basis for equitable tolling. *Sutton* v. *Donahoe*, Nos. 11 C 5912, 11 C 5961, 2012

WL 2863559, at *4 (N.D. Ill. July 11, 2012) (citation omitted).

Poullard filed his initial EEO complaint on June 18, 2007, and the EEOC issued its final

decision on appeal in favor of the VA on March 26, 2010. Poullard does not dispute that he did

not file a complaint in federal court within ninety days of receiving notice of that decision. Thus,

claims that arose from events occurring in 2006 and 2007 are time-barred including Poullard's

claims that he performed the duties of Chief of the Department after Kusel's retirement without a

promotion or increase in pay grade and that his request for a desk audit was denied in April or

May of 2007.

### B.     Claims Not Reported to an EEO Counselor Within Forty-Five Days

Next, the Secretary asserts that claims based on events that took place prior to January

19, 2010 (*i.e.*, forty-five days before Poullard contacted an EEO counselor on March 5, 2010) are

time-barred including the admonishment received on January 27, 2009, the denial of

compensatory overtime in October 2009, and a performance evaluation received on November

30, 2009. As noted above, a federal employee must report unlawful discrimination to an EEO

counselor within forty-five days of its occurrence. 29 C.F.R. § 1614.105(a). "Failure to do so

equates to the violation of a statute of limitations and, notwithstanding extenuating

circumstances, . . . bar[s] a federal employee from pursuing any action against the government for violation of Title VII." *Smith* v. *Potter*, 445 F.3d 1000, 1006–07 (7th Cir. 2006) (citations omitted), *overruled on other grounds by Hill* v. *Tangherlini*, 724 F.3d 965 (7th Cir. 2013); *see also Johnson* v. *Runyon*, 47 F.3d 911, 917 (7th Cir. 1995). A time-barred discriminatory act is not actionable, even if it is related to acts alleged in timely filed charges. *Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).[9]

Because Poullard did not report the January 27, 2009 admonishment, the denial of compensatory overtime in October 2009, or the performance evaluation received on November 30, 2009 to an EEO counselor within forty-five days, these events are time-barred. Moreover, although Poullard alleges generally that he was continually assigned duties outside of his pay grade without a promotion or increase in pay grade between 2008 and 2010 (Compl. ¶¶ 25–26), he cannot recover for the denial of an increase in pay grade or denial of any promotion that occurred prior to January 19, 2010. (Poullard has not suggested that he was prevented from contacting a counselor within the requisite time period.)

Poullard contends his disparate treatment in pay claim is not time-barred under the Lilly Ledbetter Fair Pay Act of 2009. *See* Pub. L. No. 111-2, 123 Stat. 5 (codified as amended in scattered sections of 29 and 42 U.S.C.). The Act, passed by Congress in response to the Supreme Court's decision in *Ledbetter* v. *Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 127 S. Ct. 2162, 167 L. Ed. 2d 982 (2007), amended "Title VII of the Civil Rights Act of 1964 by providing that the statute of limitations for filing an EEOC charge alleging pay discrimination

---

[9] The Secretary does not contend that events that occurred prior to January 19, 2010 are time-barred for purposes of Poullard's hostile work environment claim. Indeed, under the continuing violation doctrine, because a hostile work environment claim is composed of a series of separate acts that collectively amount to one unlawful employment practice, as long as "an act contributing to the claim occurs within the filing period, the entire claim period of the hostile environment may be considered by a court for the purposes of determining liability." *Morgan*, 536 U.S. at 117.

resets with each paycheck affected by a discriminatory decision." *Groesch* v. *City of Springfield*, 635 F.3d 1020, 1024 (7th Cir. 2011). The Act provides that an "unlawful employment practice" occurs (1) "when a discriminatory compensation decision or other practice is adopted," (2) "when an individual becomes subject to a discriminatory compensation decision or other practice," or (3) "when an individual is affected by application of a discriminatory compensation decision or other practice." 42 U.S.C. § 2000e-5(e)(3)(A).

Pursuant to the Act,

> liability may accrue and an aggrieved person may obtain relief . . . including recovery of back pay for up to two years preceding the filing of the charge, where the unlawful employment practices that have occurred during the charge filing period are similar or related to unlawful employment practices with regard to discrimination in compensation that occurred outside the time for filing a charge.

*Id.* § 2000e-5(e)(3)(B). Thus, Poullard argues that he "may assert a claim of discrimination (disparate pay on the basis of sex (male) and race (black)) encompassing the period [two] years prior to the filing of his EEO complaint on April 17, 2010 (*i.e.*, April 17, 2008)." (Dkt. 47 at 7.) The Secretary maintains that Poullard's claims are not subject to the Lilly Ledbetter Fair Pay Act because his disparate pay claims are based solely on the Department's failure to promote him to the GS-13 pay grade. The court agrees.

Although the Seventh Circuit has not squarely addressed the issue, other courts of appeals have concluded that an employer's "decision whether to promote an employee to a higher paying position is not a 'compensation decision or other practice' within the meaning" of the Act. *Schuler* v. *PricewaterhouseCoopers, LLP*, 595 F.3d 370, 375 (D.C. Cir. 2010); *see also Daniels* v. *United Parcel Serv., Inc.*, 701 F.3d 620, 630–31 (10th Cir. 2012); *Noel* v. *Boeing Co.*, 622 F.3d 266, 273 (3d Cir. 2010). As the D.C. Circuit has explained, "in employment law the

phrase 'discrimination in compensation' means paying different wages or providing different benefits to similarly situated employees, not promoting one employee but not another to a more remunerative position." *Schuler*, 595 F.3d at 374 (citation omitted).

In this case, despite Poullard's attempt to frame his disparate treatment allegations as a claim for disparate pay, the gravamen of Poullard's claim is that the Department refused to reclassify him.[10]  Indeed, Poullard asserts that although he "continuously managed the department and performed duties and responsibilities of a GS-13 grade employee from April 2006 through October 2010," the Department "classified Poullard at the GS-11 grade during this entire period." (Dkt. 47 at 1.)  Similarly, Poullard maintains that, while he was "[f]orced to perform the duties of de facto Chief of the department for an additional [two] years after Dr. Mailand's appointment," he was "excluded from promotion to the very job he performed for over [two] years." (*Id.* at 3.)  And Poullard contends that he "is entitled to permanent placement as a GS-13 retroactive to 2008." (*Id.* at 10.)  Poullard's complaint contains similar allegations. (Compl. ¶¶ 34, 41, 64(d).)  Thus, Poullard objects to the Department's failure to promote him either to Chief of the Department or another GS-13 position, or, at least, to the GS-13 pay grade.

Poullard's challenge to the Department's failure to promote him to a GS-13 position is not a claim for disparate pay.  And courts have held that the denial of a government employee's request for an increase in pay grade gives rise to a failure-to-promote claim, not a claim for disparate pay subject to the Lilly Ledbetter Act.  *See, e.g.*, *Rand* v. *Sec'y of the Treasury*, 816 F. Supp. 2d 70, 75 (D.D.C. 2011) (finding that the Ledbetter Act did not apply to the Treasury's

_____

[10] Poullard alleges in his complaint that from 2008 to the present, he "has been denied 'comp time' or overtime to perform his assignments as compared to similarly situated non-black employees." (Compl. ¶ 29.)  This allegation states a claim for disparate pay.  But Poullard's only concrete example supporting this claim in response to the Secretary's summary judgment motion is that his request for overtime was denied in October 2009.  (Def.'s L.R. 56.1 ¶ 33.)  As noted above, that occurrence is time-barred.

failure to promote the plaintiff to the GS-14 grade); *Canaday* v. *Wynne*, No. 5:09-cv-247, 2010 WL 2688065, at *10 (N.D. Fla. Apr. 26, 2010) (holding that an employer's decision not to grant the plaintiff a temporary promotion to GS-12 gave rise to a failure-to-promote claim and not a claim for disparate pay subject to Ledbetter). Otherwise, "any government employee denied an accretion of duties promotion could simply recast her claim as one for pay discrimination" to avoid the forty-five day limitations period. *Rand*, 816 F. Supp. 2d at 76. Because the discriminatory acts to which Poullard objects are decisions not to grant him a promotion, discrete acts underlying his disparate treatment claims occurring prior to January 19, 2010 are time-barred and are not revived by the Ledbetter Act.

## II.     Additional Arguments

### A.     Disparate Treatment on the Bases of Race and Sex[11]

Title VII makes it illegal "for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" on the bases of race and sex. 42 U.S.C. § 2000e-2(a). To survive summary judgment on a disparate treatment claim, a plaintiff may proceed under the direct method or the indirect method of proof. *Winsley* v. *Cook Cnty.*, 563 F.3d 598, 604 (7th Cir. 2009). Poullard proceeds under the indirect method.

The indirect method has three steps. First, the plaintiff must establish a *prima facie* case of discrimination by presenting evidence that (1) he is a member of a protected class, (2) his job performance was meeting his employer's legitimate expectations, (3) he was subjected to an

---

[11] Although the Secretary asserts that Poullard abandoned his claim for disparate treatment on the basis of sex by failing to raise it in his response brief, Poullard did in fact address this claim in his response. (*See* dkt. 47 at 7 ("Poullard may assert a claim of discrimination (disparate pay on the basis of sex . . . and race . . .) encompassing the period [two] years prior to the filing of his EEO complaint.").) Therefore, the court declines to grant summary judgment on Poullard's sex discrimination claim on this basis.

adverse employment decision, and (4) the employer treated similarly situated employees outside

of the protected class more favorably. *O'Regan* v. *Arbitration Forums, Inc.*, 246 F.3d 975, 983

(7th Cir. 2001); *see also McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802, 93 S. Ct. 1817,

36 L. Ed. 2d 688 (1973). Second, if the plaintiff establishes a *prima facie* case, the defendant

must proffer a legitimate, nondiscriminatory reason for the adverse employment action.

*Goodwin* v. *Bd. of Trs. of Univ. of Ill.*, 442 F.3d 611, 617 (7th Cir. 2008); *Paluck* v. *Gooding*

*Rubber Co.*, 221 F.3d 1003, 1012 (7th Cir. 2000). Third, the plaintiff must rebut the

nondiscriminatory reason "by presenting evidence that could enable the trier of fact to find that

[the] reason is merely pretext for discrimination." *O'Regan*, 246 F. 3d at 983.

Here, Poullard cannot establish a *prima facie* case for disparate treatment because he has

not identified an adverse employment action. Although the definition of "adverse employment

action" is generous, "not everything that makes an employee unhappy is an actionable adverse

action." *Nagle* v. *Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009) (citation omitted)

(internal quotation marks omitted). Indeed, an employee "must show some quantitative or

qualitative change in the terms or conditions of his employment." *Johnson* v. *Cambridge Indus.,*

*Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). For purposes of Title VII, adverse

employment actions typically fall into three categories: "(1) termination or reduction in

compensation or other financial terms of employment; (2) transfers or changes in job duties that

cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable

changes in job conditions, such as a hostile work environment or conditions amounting to

constructive discharge." *Barton* v. *Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011).

Poullard alleges that "the agency's practice and policy of forcing plaintiff to perform

work assignments and responsibilities beyond the essential job duties set forth in his position

description and grade level, without commensurate pay and/or promotion, constitutes disparate treatment." (Compl. ¶ 34, 41.) Thus, Poullard's disparate treatment allegations suggest two adverse employment actions: (1) that the Department did not promote Poullard to a GS-13 position or to the GS-13 pay grade, and (2) that Poullard was forced to perform work assignments outside the scope of his responsibilities.

The Department's failure to promote Poullard to a GS-13 position could constitute an adverse employment action, *Jackson* v. *Cnty. of Racine*, 474 F.3d 493, 501 (7th Cir. 2007), but Poullard must first show that he applied for a vacant position. *Hill* v. *Potter*, 625 F.3d 998, 1003 (7th Cir. 2010) (citations omitted); *Jones* v. *City of Springfield*, 554 F.3d 669, 673 (7th Cir. 2009). Poullard does not point to any evidence suggesting that he applied for and was not selected for a GS-13 position after January 19, 2010. Indeed, it appears that Mailand, while holding the title of Assistant Department Head for Education and Training, served as Chief of the Department during this time.

If an employee fails to apply for a job, "he cannot make a *prima facie* case for unlawful discrimination . . . under Title VII unless the plaintiff demonstrates that the employer's discriminatory practices deterred plaintiff from applying." *Hudson* v. *Chi. Transit Auth.*, 375 F.3d 552, 558 (7th Cir. 2004) (citations omitted). Here, Semrad advised Poullard that he was ineligible for promotion to the Chief position because he had not satisfied time-in-grade requirements (Pl.'s L.R. 56.1 ¶ 23), and Poullard suggests that this explanation deterred him from applying (*see* dkt. 47 at 10). But Poullard does not indicate why this statement, presumably made at some point prior to October 2007 when Semrad left the Department, prevented him from applying for the Chief position several years later in 2010. *See Hudson*, 375 F.3d at 558 ("Hudson presented no evidence that he was prevented from applying."). Nor does he present

15

evidence indicating that Semrad intentionally made the statement to prevent him from applying because of his race or sex. *See id.* ("Although Hudson asserts that the posting for the . . . promotion was misleading, he fails to point to any facts that suggest the CTA intentionally made the posting misleading to keep him from applying."). Under the circumstances, the fact that Poullard was not promoted to a GS-13 position does not amount to an adverse action for purposes of Title VII.[12]

Pursuant to the terms of the collective bargaining agreement, Poullard could have received an accretion-of-duties promotion in pay grade without applying for a vacant GS-13 position, and instead by requesting a desk audit. Poullard requested a desk audit in February or March of 2010, and the Department denied his request. But Poullard has not presented evidence indicating that he would have been promoted to the GS-13 pay grade if his request for a desk audit had been granted. Faced with similarly speculative allegations regarding the impact of a desk audit on opportunities for promotion and advancement, courts have held that the denial of a desk audit falls short of an adverse employment action. *See, e.g.*, *Brookens* v. *Solis*, 616 F. Supp. 2d 81, 91 (D.D.C. 2009); *Wallace* v. *Johanns*, Nos. 07-0266, 08-4398, 2009 WL 511460, at *5 (E.D. La. Feb. 26, 2009).

Finally, the only remaining allegation of disparate treatment is that Poullard performed more work than other Training Specialists and took on tasks above his pay grade. But the assignment of additional work perceived to be outside the scope of one's responsibilities, without

---

[12] Poullard also fails to identify a similarly situated individual in support of his failure-to-promote claim. Poullard identifies two Caucasian "Training Specialists treated more favorably by receiving the same salary (GS-11) as Poullard but who were assigned no managerial duties or responsibilities." (Dkt. 47 at 9 (citing dkt. 50-1 Exh. 16 at 0059–60).) But these comparators do not support Poullard's claim for disparate treatment based on the Department's failure to promote him because Poullard has not identified an individual outside of his protected class who performed additional duties and received a promotion. *See Stone* v. *Whitman*, No. 02 C 2877, 2003 WL 21697370, at *4 (N.D. Ill. July 22, 2003) (finding that the plaintiff failed to make out a *prima facie* case of discrimination when he had not identified a similarly situated employee who was promoted to the GS-13 pay grade).

more, is not an adverse employment action. *See Griffin* v. *Potter*, 356 F.3d 824, 829 (7th Cir. 2004); *Haugerud* v. *Amery Sch. Dist.*, 259 F.3d 678, 691–92 (7th Cir. 2001). Indeed, Poullard has not specified how the assignment of additional work caused him real harm separate and apart from the Department's failure to promote him. Because Poullard has not identified an adverse employment action, he cannot establish a *prima facie* case for disparate treatment on the basis of race or sex. Summary judgment will be granted on Poullard's disparate treatment claims.

### B.      Retaliation Claim

Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a); *Brown* v. *Ill. Dep't of Natural Res.*, 499 F.3d 675, 684 (7th Cir. 2007). "A plaintiff may prove retaliation by using either the direct method or the indirect, burden-shifting method." *Tomanovich* v. *City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006) (citations omitted) (internal quotation marks omitted). Under either method, however, a plaintiff must show that he suffered an adverse employment action.

The purpose of the anti-retaliation provision is to "prevent employer interference with unfettered access to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (citations omitted) (internal quotation marks omitted). As such, "Title VII's anti-retaliation provision must be construed to cover a broad range of employer conduct" and, unlike the antidiscrimination provision, "is not limited to discriminatory actions that affect the terms and conditions of employment." *Thompson* v. *N. Am. Stainless, L.P.*, 562 U.S. 170,

173–74, 131 S. Ct. 863, 178 L. Ed. 2d 694 (2011) (citation omitted) (internal quotation marks omitted). Nevertheless, "[f]ederal law protects an employee only from retaliation that produces an injury, and therefore, an employer's retaliatory conduct is actionable only if it would be materially adverse to a reasonable employee." *Stephens* v. *Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (citation omitted).

Here, Poullard alleges that after he filed his EEO complaints and objected to performing duties outside his pay grade, he was retaliated against for his protected conduct. First, Poullard contends that "defendant's refusal to pay Poullard for the performance of GS-13 duties . . . was nothing but a continuing form of retaliation" for filing his first EEO complaint in 2007. (Dkt. 47 at 12.) Because Poullard did not apply for an open GS-13 position, the only way he could be compensated at the GS-13 grade is by requesting a desk audit. Poullard did so and his request was denied. But whether Poullard would have been reclassified to the GS-13 pay grade if his request for a desk audit had been granted is "mere speculation," and therefore, the denial of his request does not amount to an adverse action.[13] *Brookins*, 616 F. Supp. 2d at 91 (finding that the denial of a desk audit did not constitute an adverse employment action, even "under the more lenient standard . . . for retaliation claims," because it was unclear whether the denial caused materially adverse consequences). Indeed, it cannot be said that the denial of a desk audit is likely to deter victims of discrimination from complaining to the EEOC, the courts, or their employers. *See Burlington*, 548 U.S. at 68.

Second, Poullard asserts that "he was subject to constant threats when he questioned Mailand why he was required to perform her GS-13 duties following her appointment." (Dkt. 47

---

[13] For similar reasons, Poullard's claim that the Department's failure to update his position description has adversely affected his ability to seek a promotion "either in or outside the Agency" (dkt. 47 at 13–14) is too speculative to survive summary judgment. The Department's failure to update Poullard's position description does not constitute an adverse employment action.

at 12.)  Poullard points in particular to the October 2008 meeting at which Cardinali stated, "I know people in Washington, D.C. and if you file a complaint, they are going to send it back to me and I'm going to deal with you."  (Pl.'s L.R. 56.1 ¶ 27.)  The only other specific allegation that could be perceived as a threat is that on January 27, 2009, Poullard received a letter of admonishment for failing to follow the chain of command after complaining to Holt about performing Mailand's duties.  Poullard, however, does not maintain that he was denied pay or disciplined as a result of these threats.  As such, these unfulfilled threats cannot constitute adverse employment actions.  *See Nagle*, 554 F.3d at 1121 (finding that the discussion of a suspension that was never actually served was not an adverse action); *Ajayi* v. *Aramark Bus. Servs., Inc.*, 336 F.3d 520, 531 (7th Cir. 2003) ("An unfulfilled threat, which results in no material harm, is not materially adverse." (citations omitted)); *see also Musa-Muaremi* v. *Florists' Transworld Delivery, Inc.*, No. 09 C 1824, 2011 WL 4738520, at *18 (N.D. Ill. Oct. 5, 2011) (finding that the plaintiff had not identified an adverse employment action with respect to her retaliation claim "because no discipline was issued and there was no loss in benefits").

Finally, Poullard maintains that after filing his second EEO complaint in 2010, "the Agency removed Poullard from all managerial duties . . . and assigned him purely clerical duties."  (Dkt. 47 at 13.)  "[S]ignificantly diminished material responsibilities" can constitute an adverse employment action.  *See Hottenroth* v. *Vill. of Slinger*, 388 F.3d 1015, 1029 (7th Cir. 2004).  But this theory of retaliation does not appear in Poullard's complaint, perhaps because it is at odds with his central claim that he was forced to perform *additional* duties.  Therefore, it is not properly before the court.  Indeed, "a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."  *Grayson* v. *O'Neill*, 308 F. 3d 808, 817 (7th Cir. 2002) (citations omitted) (internal quotation marks omitted); *Lara-*

*Woodcock* v. *United Air Lines, Inc.*, 999 F. Supp. 2d 1027, 1046 n.9 (N.D. Ill. 2013) (finding that

the plaintiff waived a new theory supporting her retaliation claim by failing to include it in her

complaint).  Poullard filed his second EEO complaint on April 17, 2010, and he suggests that he

was stripped of managerial responsibilities shortly thereafter.  (*See* dkt. 47 at 16 ("[T]he

proximity-in-time between Poullard's second EEO complaint in 2010 and his relegation to the

performance of menial clerical responsibilities is . . . suspect.").)  As such, Poullard was

presumably aware of his loss of responsibilities when he filed suit on September 19, 2012, yet

chose not to include these allegations in his complaint.  Accordingly, this theory of retaliation

has been forfeited.  The Secretary's motion for summary judgment will be granted with respect

to Poullard's retaliation claim.

C.     **Hostile Work Environment Claim**

An employer may be liable for Title VII discrimination if a plaintiff is subject to a hostile

work environment because of his protected status.  *Mason* v. *S. Ill. Univ. at Carbondale*,

233 F.3d 1036, 1043 (7th Cir. 2000).  To recover for a hostile work environment, a plaintiff must

demonstrate that (1) he was subject to unwelcome harassment; (2) the harassment was based on

his protected status; (3) the harassment was severe and pervasive so as to alter the conditions of

the plaintiff's environment and create a hostile or abusive working environment; and (4) there is

a basis for employer liability.  *Id.* (citing *Parkins* v. *Civil Constructors of Ill., Inc.*, 163 F.3d

1027, 1032 (7th Cir. 1998)).  The Secretary argues that Poullard has not satisfied the third prong.

A hostile work environment exists when the plaintiff is subject to conduct so severe and

pervasive that a reasonable person would find the work environment abusive or hostile.

*Salvadori* v. *Franklin Sch. Dist.*, 293 F.3d 989, 997 (7th Cir. 2002) (citing *Oncale* v. *Sundower

Offshore Serv., Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)).  To determine

whether the harassment was severe or pervasive, the court considers "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Ngeunjuntr* v. *Metro. Life. Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998) (quoting *Harris* v. *Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).

In this case, Poullard alleges that he was subjected to a hostile work environment because of his race, sex, and prior EEO complaints. (*See* Compl. ¶ 58.) Poullard points to three incidents in which he experienced racial slurs or comments based on his sex. First, Poullard asserts that at a meeting on October 8, 2008, Cardinali threw a toy monkey at him and stated that management intended to "get monkeys off their backs." (Pl.'s L.R. 56.1 ¶ 27.) Poullard later received a document entitled "Management Time: Who's Got the Monkey" which Cardinali referenced during the meeting. (*Id.*) Second, that same month, Mailand referred to Poullard as a "sugar daddy." (Def.'s L.R. 56.1 ¶ 31.) Third, in November 2009, Mailand told Poullard that he looked more presentable after cutting off his "afro." (*Id.* ¶ 33; Compl. ¶ 28.) As an initial matter, these comments are not as overtly racist or sexist as the unambiguous slurs courts have found to be severe. *See, e.g.*, *Cerros* v. *Steel Techs., Inc.*, 398 F.3d 944, 950 (7th Cir. 2005) ("[W]e have recognized before that an unambiguously racial epithet falls on the more severe end of the spectrum." (citation omitted) (internal quotation marks omitted)). In any event, "[t]he mere utterance of a racial epithet that engenders offensive feelings does not sufficiently affect the conditions of employment to create a hostile work environment." *Salvadori*, 293 F.3d at 997 (citation omitted). The three incidents identified by Poullard were isolated in time, and Poullard has not shown that the comments were physically threatening or that they unreasonably

interfered with his work performance. *See id.* (holding that two isolated offensive comments targeted at the plaintiff over the course of two years did not create a hostile work environment).

Poullard also supports his claim by pointing to a January 27, 2009 letter of admonishment for failing to follow the chain of command, an October 2009 denial of his request for overtime, a November 2009 "fully successful" performance evaluation, and Mailand's demanding documents and setting strict work deadlines for Poullard in February 2010. (Def.'s L.R. 56.1 ¶ 33.) But to survive summary judgment, Poullard must present evidence of harassment so severe or pervasive that it created an abusive work environment. These events amount to "normal workplace friction" and do not meet this standard. *See Herron* v. *DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) (holding that the plaintiff's complaints "about transfers, a late overtime payment, his salary, and difficulties with managers" were insufficient to constitute a hostile work environment). Further, Poullard alleges generally that the Department refused to recognize the additional hours Poullard worked to coordinate an orientation event, that he was given work outside of his pay grade, and that he was subjected to threats of disciplinary action when he complained of performing Mailand's duties. (Def.'s L.R. 56.1 ¶ 33.) General assertions alone, however, without specific, concrete facts, are insufficient to defeat a motion for summary judgment. *See Lucas* v. *Chi. Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004) ("[C]onclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment.") Cardinali stated at the October 2008 meeting, "I know people in Washington, D.C. and if you file a complaint, they are going to send it back to me and I'm going to deal with you" (Pl.'s L.R. 56.1 ¶ 27); although evidence of retaliation, this single isolated threat cannot support a claim for a hostile work environment. *See Filipovic* v. *K & R Exp. Sys., Inc.*, 176 F.3d 390, 398

(7th Cir. 1999) ("[R]elatively isolated instances of nonsevere misconduct will not support a claim of a hostile environment.").

Even if one takes all of these allegations together, a reasonable jury could not conclude that Poullard endured a hostile work environment.  Indeed, Poullard's evidence, if fully believed, fails to demonstrate that his work environment was "permeated with discriminatory intimidation, ridicule and insult" so severe and pervasive as to alter the terms and conditions of his employment.  *Harris*, 510 U.S. at 21 (citation omitted) (internal quotation marks omitted). Summary judgment will be granted on Poullard's hostile work environment claim.

## CONCLUSION AND ORDER

For the foregoing reasons, the Secretary's motion for summary judgment (dkt. 39) is granted.  This case is terminated.

Date:  March 26, 2015

_____
U.S. District Judge Joan H. Lefkow